JUDGE TORRES

# 14 CV  4062

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DMS MANAGEMENT (USA) INC.,

        Plaintiff,

-against-

STEVEN J. GOODMAN,

        Defendant.

Index No.



RECEIVED

JUN 05 2014

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, DMS Management (USA) Inc. ("DMS USA"), by and through its attorneys, Reed Smith LLP, as and for its complaint against defendant Steven J. Goodman, hereby alleges as follows:

## NATURE OF THE ACTION

1.     DMS USA brings this action to halt an 8 month barrage of extortionate threats by Steven J. Goodman ("Defendant," "Mr. Goodman," or "Goodman") – the failed former Group Chief Executive Officer and Director of Tangerine Investment Management, Inc. ("Tangerine"), who served in such capacities at a contractual annual salary of $300,000 throughout his five month employment at the evanescent and non-operational Tangerine – to disparage and damage the businesses of DMS USA and its affiliates by asserting Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*) claims against DMS USA, seeking

hundreds of millions of dollars in damages, based upon allegations so far removed from reality that they might find appropriate venue only in the Court of the King and Queen of Hearts.

2.      Despite being contractually responsible, pursuant to the terms of his service (*i.e.*, employment) agreement, for Tangerine's business until his voluntary resignation from the company under a cloud, Mr. Goodman is now attempting to shift blame to DMS USA and others within the DMS-affiliated companies for his egregious mismanagement of Tangerine's affairs, and for the alleged fraudulent conduct of Tangerine's sole shareholder, and Mr. Goodman's former direct supervisor, Timothy Schools ("Schools"), who one of Tangerine's liquidators described as the "driving force behind" Tangerine.

3.      Indeed, Goodman's threatened RICO claims against DMS USA and others are not related to any alleged conduct by DMS USA, but instead are based upon the alleged misconduct of two Cayman Islands companies, Tangerine and Axiom Legal Financing Fund ("Axiom"), in connection with an alleged breach of the service (*i.e.,* employment) agreement between Mr. Goodman and his former employer, Tangerine.

4.      In a wholly transparent effort to extort a settlement from sources he believes to have deeper pockets, Mr. Goodman is thus turning a routine employment dispute with Tangerine for approximately $3,700 in unpaid wages and benefits that allegedly accrued prior to his voluntary resignation, into a RICO claim against DMS USA, allegedly for hundreds of millions of dollars.  And since asserting claims in any way analogous to his threatened RICO claims in the courts of the Cayman Islands would subject Mr. Goodman to adverse cost awards for every penny spent by DMS USA or its affiliates in securing their dismissal, Mr. Goodman threatens to seek to bootstrap a similarity in names among DMS USA and its offshore affiliates into RICO

claims against this New York company with no ties to Tangerine or Axiom, thereby gaining access to the Courts of the Southern District, where he reasonably perceives less risk of being held accountable for the costs that will be run up by DMS USA in defending his spurious claims.

5.      Specifically, DMS USA played no role in the negotiation, execution or alleged breach of Mr. Goodman's service agreement and, in fact, has never provided any type of service whatsoever to Mr. Goodman or his controlled entities.   Moreover, DMS USA was not even incorporated until *after* Mr. Schools had recruited Mr. Goodman and he had entered into the service agreement at issue.   As such, Mr. Goodman has failed to put forth any factual or legal basis upon which DMS USA could be held liable under RICO, or any other cognizable theory of state, federal or common law.

6.      Rather than accepting the consequences of his own multiple failures during his short time at Tangerine, as well as the failures and alleged fraudulent conduct of his former superior Mr. Schools, Mr. Goodman is now seeking retribution and also attempting to *profit* from this wrongdoing and alleged fraud by shifting the blame to one of Tangerine's former independent directors, Dawn Cummings, an executive director of DMS Offshore, who refused to acquiesce or be cowed by threats from Schools, David Rae ("Rae"), the disgraced former Chief Operating Officer of Tangerine, and their cohorts, and instead performed her role as an independent director appropriately by acting courageously and decisively in helping to promptly put an end to Mr. Schools' misfeasance and alleged malfeasance.   Indeed, Ms. Cummings – as the independent director that Mr. Goodman seeks to target through his misdirected claims against DMS USA – at all times comprised a *minority* of the board of directors of Tangerine.   But further evidencing Mr. Goodman's wanton pursuit of deep pockets above all else, Ms. Cummings, and not Schools, Rae or any of their cohorts that also served as directors, appears to

be the sole target of Mr. Goodman's disingenuous claims.  Adding insult to injury, in fact, Mr. Goodman and one of Mr. Schools' key "co-conspirators," Mr. Rae, are actively cooperating in this shakedown.

7.      As Mr. Goodman's allegations against DMS USA are entirely unsupportable, and involve conduct that occurred entirely outside the United States, this is precisely the type of claim Mr. Goodman's own attorney, Howard Foster, has stated does not belong in the courts of the United States:

> Our federal courts are crowded, and judges are generally spread very thin.  They are skeptical of civil RICO cases to begin with because of their use by inept plaintiffs' lawyers who don't understand the law and because RICO is so complicated.  Federal judges should not have to devote time to a complex case that does not belong in U.S. courts.  Perhaps this will clear away some far-fetched RICO cases so legitimate ones can be heard.

Howard W. Foster, *RICO No Longer Applies to Foreign Conduct* (Sept. 30, 2012), http://www.fosterpc.com/index.php?s=norex&x=0&y=0.

8.      For all of these reasons, as more fully demonstrated below, DMS USA does not and cannot have liability under RICO, as there is absolutely no connection between DMS USA and Mr. Goodman's threatened claims.  Despite this, and his utter inability to articulate a good faith basis for his RICO claims against DMS USA, Mr. Goodman continues to threaten distracting and costly, and therefore *per se* damaging, RICO litigation against DMS USA.  As such, DMS USA hereby seeks a declaration of non-liability under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, and any other theories of liability arising under state law, federal law or common law.

## I. THE PARTIES

9.      Plaintiff DMS Management (USA) Inc. (as previously defined, DMS USA) is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1120 Avenue of the Americas, New York, New York 10036.   DMS USA is an indirect subsidiary of DMS Offshore Investment Services Ltd. ("DMS Offshore"), a company organized under the laws of the Cayman Islands.   DMS USA is a separate legal entity from DMS Offshore and operates as an independent company with its own board of directors and management team.

10.      Upon information and belief, Mr. Goodman is a resident of Queensland, Australia and is a principal of Teras International Corp. ("Teras"), which is a private consulting group based in Singapore specializing in litigation funding for legal claims and other related services.

## II. JURISDICTION AND VENUE

11.      This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure to determine the respective rights and liabilities of the parties under, among other things, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

12.      This Court has subject matter jurisdiction as this case involves a federal question pursuant to 28 U.S.C. § 1331 because this case arises under a federal statute, namely 18 U.S.C. § 1961, *et seq.*

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the matter in controversy, exclusive of interest or costs, exceeds $75,000.

14.     Upon information and belief, Mr. Goodman regularly conducts business within this District.  As such, this Court has personal jurisdiction over Mr. Goodman.

15.     Venue is proper under 28 U.S.C. § 1391(c)(3) because Defendant is not a resident of the United States and DMS USA maintains its principal place of business within this District.

## III. FACTUAL BACKGROUND

### A.     Mr. Goodman's Service Agreement With Tangerine

16.     Tangerine is a Cayman-incorporated company currently in liquidation in the Cayman Islands.  Mr. Schools is Tangerine's sole shareholder and also served as Tangerine's Chief Executive Officer and one of its directors until his resignation in October 2012.  Tangerine was, and continues to be, wholly owned by Mr. Schools.

17.     Upon information and belief, pursuant to a deed of assignment dated March 1, 2012 (the "March 2012 Assignment"), Tangerine became investment manager to Axiom, a segregated portfolio of JP SPC 1, which is an investment company incorporated in the Cayman Islands.  Ronan Guilfoyle ("Guilfoyle"), a managing director of DMS Offshore, serves as a director of JP SPC 1 in his personal capacity.  Mr. Guilfoyle has no role or title with DMS USA. Axiom's business was to provide loans to certain pre-approved law firms in the United Kingdom to finance commercial disputes in exchange for a share of the potential recoveries.

18.     Prior to the March 2012 Assignment, The Synergy Solution Limited ("Synergy"), a company also founded by Mr. Schools, served as investment manager to Axiom.  Synergy does not have, and has never had, any affiliation with DMS USA or DMS Offshore.

19.     Additionally, Synergy IOM Limited ("SIL"), another entity in which Mr. Schools had an ownership interest along with David Kennedy, served as Axiom's loan manager at all material times.  Mr. Kennedy, in addition to being a co-owner of SIL, was also named as a defendant in the Axiom Complaint (as defined herein) for his role at SIL and Axiom.  Neither Mr. Kennedy nor SIL has, or has ever had, any affiliation with DMS USA or DMS Offshore. SIL was responsible for managing the disbursements of Axiom's loans to law firms and the repayment of said loans.  Mr. Schools and Mr. Kennedy were responsible for screening potential law firms requiring loans as well as vetting each loan with the insurance underwriters before instructing SIL to make payments.

20.     Tangerine was incorporated on December 19, 2011, at which time, Ms. Cummings, an executive director of DMS Offshore, was appointed to Tangerine's board of directors in her personal capacity.  Ms. Cummings has no role or title with DMS USA.  Nor did she have any role or title with Axiom's prior investment manager, Synergy, or its loan manager, SIL.  Tangerine's other directors were Schools and Nathan Bloch, who also served as the company's Chief Financial Officer until his resignation in August 2012.  Tangerine subsequently appointed Gordon Walker and Mr. Rae to its board of directors on May 17, 2012 and June 22, 2012, respectively.  None of Mr. Schools, Mr. Bloch, Mr. Walker or Mr. Rae have, or have had, any affiliation with DMS USA or DMS Offshore.

21.     On or about March 29, 2012, Mr. Goodman entered into a service agreement (the "Service Agreement") with Tangerine, pursuant to which Mr. Schools appointed Mr. Goodman as a Director and Chief Executive Officer of the Tangerine group of companies including, upon its formation, Tangerine Litigation Funding Limited ("TLF").   TLF would serve as investment manager to a proposed new fund, Tangerine Litigation Fund SP (the "Tangerine Fund").   A true and correct copy of the Service Agreement is attached hereto as Exhibit A.   Neither DMS USA nor any of its employees, directors, officers or agents had any role in, or even knowledge of, the Service Agreement or Mr. Goodman's employment with Tangerine.

22.     Pursuant to the Service Agreement, Mr. Goodman had "sole, absolute, and unlimited discretion" on Tangerine's and TLF's behalf to manage Tangerine's litigation funding business.  *Id.* at § 2.3.   At the time of Mr. Goodman's appointment and all times thereafter, Tangerine's only litigation funding-related business was as the investment manager of Axiom. Upon information and belief, Mr. Goodman was responsible for approving certain loans Axiom made to law firms in the United Kingdom.

23.     In exchange for his service, Tangerine agreed to pay Mr. Goodman $300,000 a year plus benefits.   Mr. Goodman was also entitled to (a) a performance bonus equal to a percentage of the investors' profits (the "Management Performance Bonus") and (b) an additional bonus out of any excess management fees (the "Management Fee").  *Id.* at §§ 6.4-6.5. But if Mr. Goodman's employment was "terminated for any reason," he would only be entitled to the bonus "attributable to investments made by," or payable to, Tangerine or the Tangerine Fund "as at or prior to the date of [his] termination."  *Id.* at § 6.6.

B.      **Investigation Into Axiom**

24.     In August 2012, the publication known as *Offshore Alert* ran an article claiming that Mr. Schools was the subject of disciplinary action by the Solicitors Regulation Authority ("SRA") in England for professional misconduct.  The *Offshore Alert* article did not attribute any part of the subject matter of the SRA's proceedings against Mr. Schools to the business of Axiom or Tangerine, but it did mention Mr. Schools' relationship to Tangerine and Axiom.  In October 2012, subsequent articles in *Offshore Alert* asserted that Mr. Schools, in his capacity as Tangerine's Chief Executive Officer and sole shareholder, had mismanaged Axiom and engaged in possible fraud.

25.     In light of the allegations contained in the October 2012 *Offshore Alert* articles, Mr. Guilfoyle and the other director of JP SPC1 requested that Mr. Schools respond to the allegations, and appointed KPMG to investigate the allegations relating to Axiom.  Additionally, on or about October 17, 2012, Ms. Cummings resigned from her position as director of Tangerine because of Mr. Schools' continual failure and refusal to respond to her repeated requests for information in the wake of *Offshore Alert's* allegations against him.

26.     On or about November 15, 2012, upon the completion of KPMG's preliminary investigation, JP SPC1 terminated Tangerine as Axiom's investment manager in accordance with the parties' Investment Management Agreement.  JP SPC1 also appointed the law firm K&L Gates to evaluate the loans Axiom had made to law firms, and subsequently initiated proceedings before the Grand Court of the Cayman Islands to appoint independent receivers over Axiom, which the Cayman Court did.

27.     On or about June 19, 2013, Axiom's independent receivers commenced an action in the London High Court against Mr. Schools, Mr. Rae, and eleven other defendants alleging that monies invested into Axiom were misappropriated pursuant to a "fraudulent scheme concocted" by Mr. Schools (the "Axiom Complaint").  Significantly, Axiom's receivers did not name as a defendant or allege any wrongdoing against Ms. Cummings, Mr. Guilfoyle, DMS USA or DMS Offshore. In fact, the Axiom Complaint does not even mention any DMS-affiliated entity or individual anywhere in its sixty-six pages.

28.     According  to the Axiom Complaint, the majority of loans advanced by Axiom were to the law firms of Ashton Fox Solicitors Limited ("Ashton Fox") and its predecessors (approximately £63 million), and Rohrer & Co. Limited ("Rohrer") (approximately £14 million). Mr. Schools allegedly had a direct financial interest in both law firms.  Additionally, from November 2009 through December 2011, Ashton Fox and Rohrer were the only two law firms to which Axiom advanced loans.

29.     Notably, the Axiom Complaint alleges that Mr. Rae "was a key person within [Tangerine] advising [Axiom] on the distribution of loans, and, at the same time, was a beneficial owner of Ashton Fox."  Mr. Rae, and not Ms. Cummings, DMS USA, DMS Offshore or any other DMS-affiliated individual or entity, was "responsible for the due diligence supposed to be carried out in respect of each" law firm to which Axiom advanced monies.

30.     As alleged in the Axiom Complaint, while Axiom did advance funds to law firms other than Ashton Fox and Rohrer between December of 2011 and October of 2012, the total of these loans amounted to less than a third of the total amount of funds advanced by Axiom. Importantly, two of the loans advanced during this time period, one to Ingrams and the other to

Drake Legal, were made while Mr. Goodman was employed by Tangerine, at which time he had the "sole, absolute and unlimited discretion" to manage Tangerine's litigation funding business.

31.     Significantly, for purposes of this action, the majority of the improper loans, as alleged in the Axiom Complaint, were negotiated, documented, and made *prior* to both Tangerine's incorporation on December 19, 2011 and, more importantly, DMS USA's incorporation on April 5, 2012.  In other words, DMS USA did not even exist when most, if not all, of the alleged acts that underlie Mr. Goodman's baseless RICO claims took place, rendering those claims dead on arrival.

**C.     Mr. Goodman Resigns From Tangerine**

32.     On or about September 3, 2012, Mr. Goodman resigned from Tangerine because Mr. Rae (with whom Mr. Goodman is now cooperating) had allegedly anticipatorily repudiated the Service Agreement.  At the time of Mr. Goodman's resignation, neither TLF nor the Tangerine Fund had been formed, but Mr. Goodman still received his prorated base salary through and including August 2012.

**D.     The English Action**

33.     On or about December 22, 2012, Mr. Goodman filed suit against Tangerine in the Queen's Bench of the High Court in London (the "English Action"), claiming damages for breach of contract.  Despite being fully paid in accordance with the Service Agreement for his tenure, and claiming that he is owed $3,700 which is in dispute, Mr. Goodman dubiously sought $871,000 in unpaid salary and benefits, $26,160,000 in performance bonuses, and a $12,299,105 "adjustment" for lost tax advantage.

34.     Notably, Mr. Goodman's Particulars of Claim filed in the English Action does not mention DMS USA, or any other employee or affiliate of DMS USA, as having any part in the conduct Mr. Goodman alleged amounted to a breach of the Service Agreement.   Additionally, Mr. Goodman only mentioned Ms. Cummings twice in passing in the Particulars of Claim:  first to note that she was one of the directors of Tangerine, and second to note that she had counter-signed a second copy of the Service Agreement after he and Mr. Schools had already executed the contract.

35.     Tellingly, in the English Action, Mr. Goodman did not assert claims against Messrs. Schools, Bloch, Walker or Rae.   None of them have any affiliation with DMS USA or any other of the DMS Parties, but they were all directors of Tangerine at one time or another. More significantly, Mr. Schools and Mr. Rae negotiated directly with Mr. Goodman prior to his entry into the Service Agreement, and Mr. Rae allegedly fraudulently induced him to enter into the Service Agreement.   Remarkably, but indicative of his suspect motives, Mr. Goodman threatened *DMS USA* with a fraudulent inducement claim based on *Mr. Rae's* emails despite the lack of any connection between Mr. Rae and any DMS-affiliated entity or individuals.

36.     Ten days after one of Tangerine's creditors petitioned the Grand Court of the Cayman Islands to wind up the company, on February 22, 2013 Mr. Goodman scurried for a default judgment against Tangerine, which had already been placed into liquidation in the Cayman Islands.   On March 28, 2013, the High Court granted Mr. Goodman's motion, and he was awarded a default judgment in the English Action against Tangerine in the sum of £25,770,075.59 (approximately $42 million) plus interest at 8% per annum and costs.

**E.**      **Mr. Goodman Threatens Suit Against DMS**

37.      On or about November 12, 2013, Mr. Goodman, through his counsel, Howard Foster of Foster P.C., sent a letter (the "November 2013 Letter") to Don Seymour, a Managing Director of DMS Offshore in the Cayman Islands, stating, among other things, that Mr. Foster's firm has been retained to represent Mr. Goodman "in an action against" DMS USA, DMS Offshore, Cummings, Guilfoyle, and "others within the DMS group," (collectively, the "DMS Parties") "for [their] complicity in the fraudulent statements made to [Mr. Goodman] about the financing of Tangerine, which induced him to enter into the [Service Agreement] . . . ."

38.      Although Mr. Goodman was vested with "all rights and powers of whatsoever nature as shall be necessary for him to properly and efficiently perform his duties under this [Service] [A]greement," and also had the "sole, absolute, and unlimited discretion" to manage Tangerine's litigation funding business, *see* Ex. A at § 2.3, he had the audacity to blame the DMS Parties for Tangerine's mismanagement.

39.      For example, the November 2013 Letter inexplicably alleges that the DMS Parties were complicit in "fraudulent statements made to [Mr. Goodman] about the financing of Tangerine which induced him to enter into the employment agreement." But neither DMS USA nor any of the other DMS Parties communicated with Mr. Goodman about his decision to enter into the employment agreement as, in fact, Mr. Goodman was hired by Mr. Schools and, as alleged above, he and Mr. Rae made the allegedly inducing statements. Mr. Goodman concedes as much, noting that he accepted his position with Tangerine "after a considerable period of negotiation *with Mr. Timothy Schools* . . . ." (emphasis added).

40. Additionally, the November 2013 Letter alleges that Ms. Cummings "was responsible for Tangerine performing its duties as investment manager to Axiom and her failure to do so, including her failure to provide information to the Axiom directors, resulted in the termination of the Investment Management Agreement and the loss of Tangerine's sole source of income, which was a direct and significant cause of Tangerine's insolvency." But as Axiom's Supplemental Offering Memorandum dated January 2012 makes clear, Mr. Schools took the "lead role in liaising with law firms and negotiating loan agreements," not Ms. Cummings. Likewise, the Axiom Complaint alleges that Mr. Schools "was ultimately the individual exercising control over where the [Axiom] funds were to be transferred."

41. Finally, the November 2013 Letter claims that the DMS Parties "are legally responsible for the damages to Mr. Goodman," and asserts that the DMS parties are engaged in a "long-running scheme" which unmistakably was a reference to the "pattern of racketeering" activity punishable under RICO. Indeed, Mr. Foster later confirmed that RICO was one of the claims Mr. Goodman had retained him to bring against the DMS Parties.

42. Notably, Mr. Foster is described on his firm website, http://www.fosterpc.com, as a "RICO attorney" who has been practicing "RICO Law for the last 14 years" and "teaches civil RICO at the Illinois Institute of Technology (Kent) Law School in Chicago." Further, Foster PC advertises itself as the "RICO LAW FIRM" that "[r]epresent[s] individual victims of racketeering."

43. Moreover, Mr. Goodman – being represented again by Mr. Foster – currently is pursuing other RICO claims. Teras, as the assignee of the liquidator of a Hong Kong company,

Yick Bo Trading Limited, is currently prosecuting RICO claims in this Court against Yick Bo's parent company and several individual defendants in Case Number 13-CV-6788 (Caproni, J.).

**F.    Mr. Goodman Purchases Tangerine's Claims Against Third Parties**

44.     On or about March 18, 2014, Mr. Goodman entered into a deed of assignment (the "Deed of Assignment") with Tangerine and Ian Stokoe, one of two joint official liquidators of Tangerine, whereby Tangerine made an assignment, subject to approval by the Cayman Court, of all claims Tangerine might have against, among others, Ms. Cummings, Mr. Guilfoyle, and DMS Offshore but, notably, not DMS USA.

**G.    Mr. Goodman Reiterates His Threat to Sue DMS USA For RICO Violations**

45.     Despite demonstrating to Mr. Goodman the baselessness of his threatened claims, including the RICO claims, by letter dated April 4, 2014 (the "April 2014 Letter") to undersigned counsel, Mr. Goodman, through his attorney, Mr. Foster, indicated that all of his claims against the DMS Parties amounted to $177 million, of which Mr. Goodman's interest is $123 million.  This amount is derived in part from the default judgment of over $42 million Mr. Goodman obtained in the English Action.  The rest is made up of interest and amounts which are described as "loss to Tangerine."

46.     As relevant here, the April 2014 Letter reiterates Mr. Goodman's threats of litigation against the DMS Parties:

> Mr. Goodman has been very patient so far but does anticipate taking action to file in Cayman and/or New York promptly if there is to be no mediation or if there is undue delay. . . . Finally, our agreement to refrain from filing suit on Mr. Goodman's claim which was the subject of the unsuccessful mediation this week is over.  That claim was not resolved.

47.     To date, Mr. Goodman has not presented or referred to any evidence to justify his RICO, or any other, claims contained in the November 2013 Letter.  For example, Mr. Goodman stated in the November 2013 Letter that the DMS Parties have been engaged in a "long-running scheme" concerning the provision of their management services.  But DMS USA is (a) a marketing company, (b) does not provide any management services, (c) did not provide any services to any Tangerine-related entities, and (d) has only been incorporated since April 2012— *after* Mr. Goodman entered into the Service Agreement.  Indeed, the vast majority, if not all, of the alleged misconduct by Axiom and Tangerine that Mr. Goodman complains of took place well before DMS USA's incorporation in April 2012.  Thus, DMS USA has not been, and could not have been, engaged in the "long-running" behavior that Mr. Goodman alleges.

48.     Additionally, Mr. Goodman's allegations against the DMS Parties relate entirely to offshore conduct, offshore management, and offshore entities.  Mr. Goodman has utterly failed to articulate how DMS USA is involved in an alleged offshore scheme, nor has he explained how DMS USA's conduct is within the territorial reach of the RICO statute.  Indeed, this is the very sort of alleged conduct that Mr. Goodman's "RICO Attorney," Mr. Foster, specifically noted in an article on his website, which is quoted above, is not the sort of conduct for which RICO provides any redress.

49.     Further, when it enacted RICO, Congress included a civil remedy provision that allowed private parties to sue in U.S. state or federal court for injuries to their business or property caused by reason of a defendant's violation of the statute.  18 U.S.C. § 1964 (c).  Under this provision, a private plaintiff may sue in state of federal court to recover treble damages and attorney's fees caused by a RICO violation.  Given its threat of treble damages as well as the reputational injury defendants suffer from the allegation that they are "racketeers," RICO is an

aggressive statute that, when used improperly, allows a complainant to intimidate and "shake down" an opponent.   Mr. Goodman's threatened RICO claims are a classic example of the misuse of the statute as a means of extorting a financial settlement from the DMS Parties.

50.     Despite the lack of merit in Mr. Goodman's claims, given the continuing threat of such spurious claims being asserted against DMS USA, it now seeks a declaration that is has no liability to Mr. Goodman.

## CLAIM FOR RELIEF

## COUNT 1 – DECLARATORY JUDGMENT

51.     DMS USA repeats and realleges each of the allegations contained in the preceding paragraphs of the Complaint as if they were set forth fully herein

52.     Mr. Goodman contends that DMS USA, in conjunction with the DMS Parties, engaged in a pattern of fraudulent activities concerning its management services,   thereby violating 18 U.S.C. § 1961, *et seq.*, and is thus liable to Mr. Goodman for damages and other relief.

53.     DMS USA denies all such allegations.  DMS USA is purely a marketing company which does not provide any type of fund directorship or management services.  Additionally, DMS USA was in no way involved in any of the conduct complained of by Mr. Goodman in either the English Action or the November 2013 Letter.  DMS USA was not involved in the negotiation, execution or alleged breach of Mr. Goodman's Service Agreement.  Indeed, it was foreign parties, Tangerine, Axiom and Schools, whose conduct – all of which took place outside of the United States – Mr.  Goodman claims resulted in his alleged damages, not DMS USA.

Finally, DMS USA was incorporated on April 5, 2012, after Mr. Goodman has already entered into the Service Agreement. Therefore, DMS USA in no way could have been involved in an alleged "long running scheme" or pattern of conduct that resulted in injury to Mr. Goodman. Thus, there is a dispute between the parties as to whether DMS has violated 18 U.S.C. § 1961, *et seq.*

54.     Based on all of the foregoing, a substantial controversy exists between DMS USA and Mr. Goodman with respect to Mr. Goodman's threatened RICO and other claims, and the parties have adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

55.     DMS USA is entitled to a declaratory judgment that DMS USA did not violate 18 U.S.C. § 1961, *et seq.*, and that DMS USA has no liability to Mr. Goodman for a civil RICO claim, or any other claim arising under state law, federal law, or common law.

WHEREFORE, DMS USA respectfully request that this Court declare, pursuant to 28 U.S.C. § 2201, that:

(a)     DMS USA has not violated and is not liable to Mr. Goodman for any violation of 18 U.S.C. § 1961, *et seq.*, nor does it have liability to him for any other claim arising under state law, federal law, or common law;

(b)     DMS USA is not liable to Mr. Goodman for any damages or any other relief; and

(c)     DMS USA be awarded such other and further relief as the Court deems just and proper.

Dated: June 5, 2014

REED SMITH LLP

James C. McCarroll
Jordan W. Siev
John C. Scalzo
599 Lexington Avenue
New York, New York 10022
Telephone:     (212) 521-5400
Facsimile:      (212) 521-5420
*Attorneys for Plaintiff DMS Management (USA) Inc.*

**EXHIBIT A**

DATED:  29 March 2012

(1)  TANGERINE INVESTMENT MANAGEMENT LIMITED

and

(2)  STEVEN JEREMY GOODMAN

-------------------------------------------------------------------------

**SERVICE AGREEMNT**

-------------------------------------------------------------------------

**DATED: 29 March 2012**

**PARTIES:**

(1)   **TANGERINE INVESTMENT MANAGEMENT LIMITED**, a company registered in the Cayman Islands whose address is Ground Floor, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman, Cayman Islands KY1-1201 (the "**Company**"); and

(2)   **STEVEN JEREMY GOODMAN** of 31 Jurong West Street 41, Lakeshore Apartments, Tower 2D #02-33, Singapore 649412 (the "**Executive**").

**RECITALS:**

(A)   The parties are working together and with others to form the Fund for the purposes as described in the Draft Offering Memorandum, and which is intended to be operated as described in the Draft Offering Memorandum.

(B)   The Company confirms to the Executive that it will be appointed to act as investment manager to the Fund in accordance with the Investment Management Agreement and that a new company to be called Tangerine Litigation Funding Limited ("**TLF**"), will be appointed to act as investment advisor, in accordance with the Investment Advisory Agreement.

(C)   In anticipation of the establishment and operation of the Fund and the appointment of the Company as investment manager and TLF as investment advisor, and in preparation for the associated fundraising, the Company wishes to engage the Executive and to appoint the Executive as a Director and the Chief Executive Officer of TLF.

(D)   The parties anticipate that, upon formation of the Fund, TLF will take over the employment of the Executive on the same terms as are contained in this agreement.

(E)   The Executive represents to the Company that, following execution of this agreement, he will tender his resignation from his current employment in order to take up the appointment which is the subject of this agreement.

**IT IS AGREED AS FOLLOWS:**

**1      DEFINITIONS**

1.1    In this agreement, unless the context otherwise requires, the following terms shall have the following meanings:

"**Advisory Council**" means the Fund's advisory council from time to time appointed and constituted in accordance and consistent with the Draft Offering Memorandum;

"**Commencement Date**" means 1 July 2012 or such earlier date as the Executive notifies the Company of his availability to commence the appointment;

"**Draft Offering Memorandum**" means the draft supplemental offering memorandum for the Fund in the form attached to an email dated 23 February 2012 from the Executive to Nathan Bloch (cc David Rae and Tim Schools), each being representatives of the Company, as supplemented by the contents of that email;

"**Fund**" means Tangerine Litigation Fund SP, as described in the Draft Offering Memorandum;

"**Group**" means the Company and its subsidiaries from time to time in so far as they are involved in the litigation funding business;

**"Investment Advisory Agreement"** means the investment advisory agreement to be entered into between TLF and the Company on terms to be approved by the Executive and containing terms which are consistent with, and no less disadvantageous to TLF as, those described in the Draft Offering Memorandum;

**"Investment Management Agreement"** means the investment management agreement to be entered into between the Fund and the Company containing terms which are consistent with those described in the Draft Offering Memorandum;

**"Management Fees"** means the management fees (if any) in excess of the aggregate amounts required to run the litigation funding business, of such amounts as shall be agreed from time to time by the Company and the Executive, to be paid to TLF as described in the Draft Offering Memorandum;

**"Management Performance Bonus"** means the performance bonus payable as to 50% to the Executive (or as he may designate) and as to 50% to the Company, based on the future performance of the litigation funding business of the Fund, calculated and payable to them as described in the Draft Offering Memorandum.

1.2    A reference to a document in the **"Agreed Form"** is to such document in the form agreed by the parties prior to the execution of this agreement and initialled by way of identification, or otherwise agreed in writing by them.

## 2    APPOINTMENT

2.1    The Company agrees to appoint the Executive as a Director and the Group Chief Executive Officer of TLF or (if TLF has not been formed by the Commencement Date) its litigation funding business and the Executive agrees to such appointment, as from the Commencement Date, on the terms and conditions described in this agreement. If the parties agree that TLF shall take over the employment of the Executive, the Company undertakes that it will provide the required funding to TLF to enable it to perform its obligations under this agreement as they fall due or otherwise meet the obligations to the Executive itself.

2.2    The anticipated initial place of business of the Company will be in Singapore, but the Executive may alter the place to such other place as he deems appropriate in the interests of the Company's business.

2.3    The Company hereby vests in the Executive all rights and powers of whatsoever nature as shall be necessary for him to properly and efficiently perform his duties under this agreement and he shall, in the performance of such duties, have sole, absolute and unlimited discretion on the Company's and TLF's behalf to manage the litigation funding business as he shall deem appropriate, except that the above shall be subject to any approvals as may be required from the Advisory Council.

2.4    The Company undertakes to the Executive that the final terms of each of the Offering Memorandum and the Investment Advisory Agreement, including without limitation the calculation and terms of distribution of the Management Fees and Management Performance Bonus, will be subject to the approval of the Executive and that no subsequent change will be made to the calculation and terms of distribution of the Management Fees and Management Performance Bonus or the terms of the Investment Advisory Agreement without the prior written approval of the Executive.

2.5    It is agreed that the Executive shall be one of two directors of TLF, the other being a representative of the Company.

2.6    The consultancy agreement dated 8 February 2012 made between the Company and the Executive shall continue, and be extended, until the Commencement Date.

## 3    SINGAPORE EMPLOYMENT PASS

3.1    It is a condition precedent to the Executive taking up the appointment in Singapore that an Employment Pass (EP) is granted to him by the approving authority.

2

3.2     If the employment is to be in any other country, then a similar condition precedent will apply in respect of any employment or work permit requirements that may be applicable.

3.3     The Company will be responsible for making all necessary applications to obtain such permits by the Commencement Date, and the failure to obtain any permit shall not affect the Executive's rights under this agreement.

4       **TERM**

4.1     This appointment will take effect from the Commencement Date and will continue for an initial term of three (3) years.

4.2     On each expiry date, the term will automatically be renewed for a further period of three (3) years unless the Company has given the Executive at least one (1) year's notice that it is not to be so renewed, such notice expiring no later than the date of expiry of the then current term.

4.3     The Executive may terminate the appointment by giving not less than six (6) months' notice in writing to the Company.

5       **FULL-TIME APPOINTMENT**

5.1     Except as stated below or otherwise approved from time to time by the Company, the appointment is a full-time appointment and the Executive shall devote his whole time and attention to the service of the Group.

5.2     The role and powers of the Executive shall, in relation to TLF, include:

(a)  establishing and running the essential functions of the business;

(b)  recruiting such staff as may be required on such terms as the Executive may deem appropriate;

(c)  maintaining all records regarding case investments and transactions undertaken on behalf of the Company;

(d)  using reasonable efforts to ensure compliance by TLF with the terms of the Investment Advisory Agreement;

(e)  setting and agreeing the costs and expenditure budgets from time to time;

(f)  responsibility for the overall marketing of the Fund's litigation funding business;

(g)  case investment search, selection, due diligence, investment, analysis, monitoring, realisation and termination, and making recommendations to the Advisory Council where required;

(h)  negotiating and agreeing legal documents required to complete case investments or to give effect to the realisation or termination of any case investment;

(i)  reporting to the Advisory Council, as required, informing such council of any material changes of which the Executive is aware affecting any advice or recommendation previously given, and advising such council on matters of policy and strategy; and

(j)  liaising with such other advisors to the Fund as may be required for reporting to the Fund's investors,

but the Executive's responsibilities shall not include the provision of administrative services (including office management, corporate regulatory compliance, insurance, financial control and financial reporting services), which are to be provided to TLF by the Company or any services in connection with the law firm lending business of the Fund.

3

5.3 The Company acknowledges that the Executive has disclosed to it, and hereby consents to the Executive being permitted to continue with, the following activities:

(a) his teaching of student courses at Bond University Law Faculty and his appointment as an Adjunct Professor of Law. The executive is also permitted to teach and take up other casual appointments at other academic institutions;

(b) his holding of a directorship and membership of Board committees with Chailease Holding Company and any other company with which it is affiliated; and

(c) his involvement and personal interests in litigation and litigation funding matters where the Executive's involvement commenced before 1 January 2012.

## 6    COMPENSATION OF THE EXECUTIVE

6.1 The Company shall pay the Executive a basic annual salary at the rate of US$300,000, to be paid in equal monthly instalments by no later than the final business day of each calendar month. Salary in respect of an incomplete month of employment shall be paid on a pro-rata basis.

6.2 The basic salary shall be reviewed by the Board of TLF no later than 30 November in each calendar year of the appointment and any revised basic salary (which shall not be reduced) shall take effect as from 1 January in the following calendar year.

6.3 The Executive will be entitled to the following additional benefits at the cost of the Company:

(a) private health insurance cover providing benefits commensurate with the Executive's position, and life insurance cover of at least four times his basic salary;

(b) use of computer and mobile telephone/Blackberry/iPhone equipment;

(c) reimbursement of all costs and expenses incurred by the Executive on Group business, including telephone and communication costs, travel costs (business class) and accommodation and related costs incurred on Group business;

(d) reimbursement of business entertaining expenses incurred on Group business; and

(e) reimbursement of other out of pocket expenses incurred in connection with Group business.

6.4 The Executive will be entitled to a performance bonus out of the Management Performance Bonus paid to the Company, determined and payable as referred to in clause 6.6.

6.5 The Executive will also be entitled to such additional bonuses out of such amount of the Management Fees (if any) paid to the Company or TLF as shall not be required for the Company's or TLF's costs, determined and payable as referred to in clause 6.6.

6.6 The amounts referred to in clauses 6.4 and 6.5 shall be as allocated by the Executive at such times as he shall in his sole discretion determine and, for the avoidance of doubt, it is agreed that the Executive may make an allocation to himself of such amounts as he may consider appropriate. If the appointment is terminated for any reason prior to payment of any or any part of such bonus, the Executive will remain entitled to receive the relevant bonus which is attributable to investments made by the Company or the Fund, or investments which were being considered, as at or prior to the date of termination, that would have been received or paid but for such termination.

## 7    DEDUCTIONS

7.1 The Company shall deduct from the Executive's salary and all other payments all amounts which the Company is entitled, authorised or required by law to deduct.

**8       LEAVE AND OTHER BENEFITS**

8.1      The Executive is eligible for six weeks' annual leave per calendar year. The leave eligibility in respect of an incomplete year of service will be on a pro-rata basis.

8.2      The Executive will be entitled to a maximum of ninety (90) days' paid medical leave per calendar year, which shall include hospitalisation and outpatient medical leave.

**9       CONFIDENTIALITY OF INFORMATION**

9.1      The Executive shall not, at any time before or after the termination of the appointment, use or disclose to any person, other than for the purposes of Group business, information which is confidential, sensitive or proprietary to the Group or information received from third parties by the Company under obligations of confidentiality, except as stated in clause 9.2.

9.2      The Executive may disclose any information to the extent that he is required to do so by or under any law, court or applicable regulatory body.

**10      D&O INSURANCE AND INDEMNTY**

10.1     The Company will, to the extent permitted by law, ensure that there is taken out and maintained at its cost directors' and officers' liability insurance of such amount and scope of coverage as the executive shall deem appropriate from time to time, which insurance will:

(a)   apply to the Executive from the Commencement Date and thereafter continuously until expiration of the period expiring 7 years after termination of the appointment;

(b)   provide for payment of all the Executive's actual legal costs and disbursements in the defence of each of the circumstances for which cover is provided; and

(c)   indemnify the Executive against all actual legal costs and disbursements, fines, penalties, punitive damages and all liabilities in connection with claims, demands, liabilities, judgments, orders, awards and costs against him.

10.2     To the maximum extent permitted by law, the Company indemnifies the Executive against all claims, demands, liabilities, judgments, orders, awards and costs against him in connection with the appointment and will pay as they fall due his actual legal costs and disbursements in connection with the indemnity referred to above.

**11      TERMINATION**

11.1     The Company shall be entitled to suspend or terminate the appointment on the following grounds:

(a)   if the Executive is convicted of any offence which brings the Company into disrepute; or

(b)   if the Executive fails to perform his duties and obligations under this agreement and fails to rectify the same within 90 days of being requested to do so in writing by the Company; or

(c)   if the Executive is in persistent breach of any provision or provisions of this agreement of which written notice has been given to the Executive by the Company.

11.2     The Executive shall be entitled to terminate the appointment if the Company commits a material breach of this agreement and fails to rectify the same (if capable of rectification) within 30 days of being requested to do so in writing by the Executive, or is in persistent breach of any provision or provisions of this agreement of which written notice has been given to the Company by the Executive.

**12      GOVERNING LAW AND JURISDICTION**

12.1    This agreement is governed by the law applicable in England and Wales and the parties irrevocably and unconditionally submit to the exclusive jurisdiction of the courts of England and Wales.

Executed as an agreement on the date mentioned above.

-------------------------------------------------------------
Dawn Cummings, for and on behalf of
**Tangerine Investment Management Limited**

-------------------------------------------------------------
**Steven Jeremy Goodman**